Brian J. Ward, Esq. (SBN 244387)
Erin L. Powers, Esq. (SBN 245148)
**TRIAL LAWYERS FOR JUSTICE**
877 South Victoria Avenue, Suite 201
Ventura CA 93003
Tel: 310-855-3727
Fax: 310-855-3595
Email:  teamojai@tl4j.com

Attorneys for Plaintiffs, GEORGE FRANCO
and KARLA FRANCO

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO

JUN 05 2023

BY:  Michelle Gomez-Casillas, Deputy

# SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SAN BERNARDINO

| | |
|---|---|
| GEORGE FRANCO and KARLA FRANCO <br><br> Plaintiffs, <br><br> vs. <br><br> SAFETY-KLEEN INC, A DELAWARE CORPORATION; THE ARMAKLEEN COMPANY, A DELAWARE CORPORATION; CHURCH & DWIGHT CO. INC., A DELAWARE CORPORATION; CLEAN HARBORS INC., A MASSACHUSSETS CORPORATION; AND DOES 1 THROUGH 100, INCLUSIVE <br><br> Defendants | CASE NO.  **CIV SB 2 3 1 2 9 3 4** <br><br> **COMPLAINT FOR TOXIC INJURIES ASSERTING CAUSES OF ACTION FOR:** <br> **(1) NEGLIGENCE;** <br> **(2) STRICT LIABILITY - WARNING DEFECT;** <br> **(3) STRICT LIABILITY - DESIGN DEFECT;** <br> **(4) FRAUDULENT CONCEALMENT;** <br> **(5) BREACH OF IMPLIED WARRANTIES;** <br> **(6) LOSS OF CONSORTIUM** |

## THE PARTIES

1.  At all material times hereto, Plaintiffs, GEORGE FRANCO and KARLA FRANCO, have been residing in the State of California as husband and wife.

2.  Plaintiffs are informed and believe and thereon allege that Defendant, Safety-Kleen Inc., is a Delaware corporation, which at all material times hereto, has been doing business in the County of San Bernardino, State of California.

COMPLAINT FOR TOXIC INJURIES
PAGE 1

3.      Plaintiffs are informed and believe and thereon allege that Defendant, The ArmaKleen Company is a Delaware corporation, which at all material times hereto, has been doing business in the County of San Bernardino, State of California.

4.      Plaintiffs are informed and believe and thereon allege that Defendant, Church & Dwight Co. Inc., is a Delaware corporation, which at all material times hereto, has been doing business in the County of San Bernardino, State of California.

5.      Plaintiffs are informed and believe and thereon allege that Defendant, Clean Harbors Inc. is a Massachusetts corporation, which at all material times hereto, has been doing business in the County of San Bernardino, State of California.

6.      The true names and capacities of Defendants Does 1 through 100 are unknown to Plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff will amend this complaint to state the true names and capacities of said fictitious defendants when they have been ascertained. Plaintiff is informed and believes and thereon alleges that Defendants Does 1 through 100 are in some manner responsible for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by their conduct.

7.      Plaintiff is informed and believe and based thereon allege that, at all times material hereto, each of the Defendants, including the fictitiously named Defendants, was acting in an individual, corporate, partnership, associate, parent-subsidiary, successor-predecessor, conspiratorial or other capacity or as the agent, employee, co-conspirator, and/or alter ego of its co-defendants, and in doing the acts herein alleged, was acting within the course and scope of its authority as such parent, successor, partner, associate, agent, employee, co-conspirator, or alter ego, and with the permission, consent, knowledge, authorization, ratification and direction of its co-defendants, including all fictitiously named defendants.

## GENERAL ALLEGATIONS

8.      From about 1990 through the present, Plaintiff, GEORGE FRANCO, worked as a car mechanic at his automobile repair shop in Southern California. Plaintiff is informed and

COMPLAINT FOR TOXIC INJURIES
PAGE 2

believes and thereon alleges that the injuries from which Plaintiff, GEORGE FRANCO suffers, and which are the subject of this action, were sustained in the course of Plaintiff's work as a mechanic in San Bernardino, California.

9.      In the course of and throughout Plaintiff's employment in San Bernardino, California, Plaintiff, GEORGE FRANCO, worked with ArmaKleen Company and Safety-Kleen products and was exposed to chemicals from those products.

10.     Safety-Kleen Corporation is the world's largest recycler of automotive and industrial fluid wastes. Safety-Kleen offers a Parts Washer Service, Fluid Recovery Service, Oil Recovery Service, Paint Refinishing Service, Dry Cleaner Service, and Imaging Service.

11.     The Safety-Kleen parts washer machines are all essentially a "sink-on-a-drum." The machines consist of a tank partially filled with Safety-Kleen 105 Solvent, a pump to pump solvent through a hose with a brush attached to it, and a sink in which the operator scrubs parts to degrease and clean them with the recycled solvent.

12.     Unlike most petroleum products, Safety-Kleen 105 Solvent is not a refined petrochemical product but is rather hazardous waste; it is a recycled petroleum product that is contaminated with multiple carcinogens and other toxic chemicals not ordinarily found in refined petroleum solvents.

13.     The primary constituent of Safety-Kleen 105 Solvent is mineral spirits, which is a complex mixture of aromatic and aliphatic hydrocarbons obtained from the distillation of crude oil. To this Safety-Kleen adds an antistatic agent and a green dye. The product is called "105 Solvent" because its flashpoint is supposedly 105° Fahrenheit, which would render it a combustible rather than a flammable material under various regulations.

14.     Safety-Kleen 105 Solvent is contaminated with multiple carcinogenic chemicals, including benzene, perchloroethylene, trichloroethylene, methylene chloride, chlorinated benzenes, and polycyclic aromatic hydrocarbons.

15.     Benzene is a human carcinogen that causes leukemia and other cancers at concentrations as low as 1 part per million (ppm).

16.     Benzene occurs naturally in crude oil and is therefore found in mineral spirits in varying amounts depending on the quality of the distillation process. Benzene has been detected in the virgin mineral spirits that Safety-Kleen purchases at concentrations from "not detected" up to well over one hundred parts per million.

17.     Benzene is also introduced into recycled Safety-Kleen 105 Solvent by Safety-Kleen's automotive customers. For years benzene has been used as an antiknock agent additive in gasoline. When automotive shops clean carburetors and other automobile parts using Safety-Kleen 105 Solvent, benzene is introduced into the used solvent, which is then recycled and delivered anew to customers.

18.     Safety-Kleen collects used Safety-Kleen 105 Solvent from its California customers and supplies them with recycled solvent. The used solvent is transported to the local service center, where it is put in a storage tank with used solvent from other customers. The solvent is then pumped into a tanker truck and shipped to Safety-Kleen's recycle center in Reedley, California.

19.     At the recycle center, the used solvent is pumped into a settling tank, where water, dirt and heavy oils settle to the bottom of the tank and are removed. The rest of the material is pumped into a crude evaporator. As the evaporator is heated in a vacuum, volatile chemicals evaporate, rise, and go into a condensation unit where they cool and re-condense. The first components to evaporate are low-boiling aromatics, including benzene. When benzene recondenses on the other side of the column it could be extracted from the solvent by various means, but Safety-Kleen does not extract benzene or any of the other toxic contaminants of the product. Safety-Kleen just continues heating the liquid in the evaporator until all the volatile components evaporate and recondense. The recondensed material, which is called recycled solvent (and improperly called "clean" solvent) is then delivered to customers.

COMPLAINT FOR TOXIC INJURIES
PAGE 4

20.     The process continues on and on in what has been called a "closed-loop" system. However, not all of the solvent or its carcinogenic contaminants remains in the "closed-loop" system." Unfortunately, large amounts of the solvent and its carcinogenic components is inhaled into the lungs of operators of the parts washer machines and is absorbed through their skin into their bloodstream.

21.     As a result of the ordinary use of the Safety-Kleen parts washer machine, workers inhale toxic vapors from Safety-Kleen 105 solvent aerosols which form as the solvent flows through the hose into the air in an open system, and from vapors which form as volatile components evaporate in the air. Also as a result of the ordinary and intended use of the machine, solvent splashes onto the skin of workers operating the machine. The parts washer machines are commonly used in industry, often in conjunction with an air hose, which blow-dries parts which have been degreased in the machine. It has also been a customary practice in industry for workers to wash their hands using the parts washer machine.

22.     Safety-Kleen has known for years that its "recycled" Safety-Kleen 105 Solvent contains benzene.

23.     Safety-Kleen has also known for years that benzene and other chlorinated compounds found in recycled Safety-Kleen 105 Solvent cause cancer and other serious health risks and diseases.

24.     In the early 1990s, Paul Dittmar, Safety-Kleen's Product and Process Development Manager, was assigned the task of determining the extent of the solvent contamination problem and identifying remedial technologies. In a memo addressed to the company's general counsel, Mr. Dittmar concluded that the solvent contamination problem was a major problem. He determined that a number of different technologies existed to resolve the problem, but that the best and simplest technology was fractional distillation -- technology which has been used to refine crude oil since the turn of the century.

COMPLAINT FOR TOXIC INJURIES
PAGE 5

25. Mr. Dittmar determined that the use of such technology would totally eliminate benzene from the recycled product and reduce the chlorinated content of the solvent by 90%. Mr. Dittmar, who is not only a chemist but also holds a Masters Degree in Business Administration, then proceeded to determine the cost of implementing fractional distillation technology at Safety-Kleen's domestic recycling centers. He determined that the cost of installation of the fractional distillation equipment would only be about $1 million for each of the company's half-dozen recycling facilities and that the additional cost of processing the solvent would be about 2 to 4 cents per gallon.

26. Although Safety-Kleen was aware that its recycling process was defective and that it could be easily remedied for a capital expenditure of $1 million for each of its half-dozen recycling facilities (about ½ of one percent of its annual gross revenues) and a cost of about 3 cents per gallon (which could easily have been passed on to its customers), Safety-Kleen did not install fractional distillation equipment at its recycle centers.

27. Although Safety-Kleen was aware that the benzene and chlorinated compounds in its recycled Safety-Kleen 105 Solvent caused cancer and other health problems and diseases, and knew of a cost-efficient method of removing these cancer-causing substances from Safety-Kleen 105 Solvent, Safety-Kleen instead chose to continue marketing its solvent without warnings regarding the cancer hazards of the product, and without remedying such hazards.

28. Safety-Kleen did not list carcinogens present in Safety-Kleen 105 Solvent if the carcinogen was at levels below 0.1 percent, in a further effort to lead customers and users to believe the product was safe, when in fact it was not.

29. Safety-Kleen falsely told some people that its Safety-Kleen 105 Solvent contains no benzene, and told other people benzene was not an "ingredient" of Safety-Kleen 105 Solvent to mislead people into believing there was no benzene in Safety-Kleen 105 Solvent. To further this, for many years Safety-Kleen chose not to list benzene on its parts washer machine labels to further convince customers its product contained no benzene.

30.     Without possessing any scientific or medical proof to establish the purported fact, Safety-Kleen told customers that the amount of chlorinated compounds in Safety-Kleen 105 Solvent was so minuscule that it did not create any health hazards.

31.     Safety-Kleen was aware of the toxic hazards of its 105 Solvent as demonstrated by the fact that Safety-Kleen required its employees who worked with the 105 Solvent to wear protective gear including a full chemical suit, gloves, boots and a respirator, and mandated medical testing for liver, kidney and blood disease every one to two years for those employees.

32.     Safety-Kleen's recycling process increased the levels of chlorinated compounds (e.g., perc) in Safety-Kleen 105 Solvent that Safety-Kleen distributed for use by its customers, thereby making it more harmful and toxic.

33.     Safety-Kleen's own products contributed to the contamination of Safety-Kleen 105 Solvent, thereby making it more toxic than it otherwise would have been.

34.     Safety-Kleen's only concern regarding issues with its 105 Solvent (e.g., receiving off-spec material below the flashpoint) was how such would affect Safety-Kleen's liability position, rather than a concern for the health and safety of its customers or their employees.

35.     In preparing its MSDS's, Safety-Kleen's only concern was that from a marketing perspective, listing certain carcinogenic ingredients of its 105 Solvent on MSDS's would make marketing the product more difficult. Safety-Kleen gave no consideration to the health and safety of Safety-Kleen's customers or of their right to know of carcinogens in Safety-Kleen 105 Solvent.

36.     For marketing reasons, Safety-Kleen wanted to get levels of carcinogens (e.g., perc) below OSHA levels so Safety-Kleen did not have to list those carcinogens on its material safety data sheets, but Safety-Kleen decided not to spend the money to accomplish this, because Safety-Kleen decided that it would not achieve a significant marketing benefit by being able not to list carcinogens on the material safety data sheet for Safety-Kleen 105 Solvent.

37.     Safety-Kleen could have removed perchloroethylene, benzene, and other chlorinated compounds from Safety-Kleen105 Solvent for nominal cost (2-4 cents per gallon)

COMPLAINT FOR TOXIC INJURIES
PAGE 7

through fractional distillation, but chose not to do so unless and until governmental agencies required Safety-Kleen to do such. This decision was made because Safety-Kleen's marketing department determined that removal of these compounds would not provide a sufficient marketing benefit to justify making the product safe.

38.     Although detergent-based technology was available, affordable and marketable, Safety-Kleen did not convert any of its solvent tanks to the less-toxic water-based cleaner until required to do so by law.

39.     Safety-Kleen is well aware that its 105 Solvent has contaminated multiple sites where its recycle facilities are located across the country.

40.     Multiple enforcement actions and fines have been imposed upon Safety-Kleen in California and elsewhere due to environmental non-compliance issues and Safety-Kleen's contamination of different sites in the United States.

41.     As a condition of settling a leukemia case in the 1980s, (the Junker case), Safety-Kleen required that all evidence and records be sealed by the court and destroyed by counsel to conceal information, including scientific data, that had been discovered and developed during the course of the litigation.

42.     Despite receiving hundred of claims that Safety-Kleen 105 Solvent has caused blood related cancers, other cancers, and systemic toxicity resulting in organ failure and death, Safety-Kleen continues to market its 105 Solvent today.

43.     In the course of his work of employment in California, Plaintiff, GEORGE FRANCO, was exposed to toxicologically significant levels of these chemicals.

44.     As a direct and proximate result of said exposure to said toxic chemical products, Plaintiff, GEORGE FRANCO, sustained serious injuries to his internal organs, including meningioma.

/ / /

/ / /

COMPLAINT FOR TOXIC INJURIES
PAGE 8

45.     As medical treatment for his meningioma, Plaintiff, GEORGE FRANCO, has been hospitalized and undergone surgery and other treatments and will require ongoing medically necessary and lifesaving treatment.

## TOLLING OF STATUTE OF LIMITATIONS

### Appreciable Injury and Diagnosis Postdating Exposure

46.     Plaintiff, GEORGE FRANCO, was first diagnosed with meningioma on or about June 9, 2021. Prior to said time Plaintiffs did not discover, and could not reasonably have discovered, that Plaintiff, GEORGE FRANCO, had been injured and was suffering from meningioma, the toxic nature of said injuries and disease, or their occupational cause. The pathological effect of said disease occurred without perceptible trauma and Plaintiffs were blamelessly ignorant of its cause. It was not until about June 9, 2021, that Plaintiffs were even aware that GEORGE FRANCO, had sustained any appreciable injury.

## IGNORANCE OF CAUSE OF DISEASE

47.     At the time Plaintiff, GEORGE FRANCO, was diagnosed with meningioma on or about June 9, 2021, and continuing thereafter until the present date, no physician ever told Plaintiff, GEORGE FRANCO, what the cause of Plaintiff's meningioma was or that Plaintiff's meningioma even had a cause.

## SUSPICION OF CAUSE OF DISEASE

48.     The first time Plaintiffs suspected that Plaintiff, GEORGE FRANCO's meningioma might be occupationally related was on or about June 9, 2021.

## IGNORANCE OF IDENTITY OF INJURY-CAUSING HAZARDOUS SUBSTANCES

49.     Notwithstanding their diligent efforts, at no time even until the present date did Plaintiffs personally ascertain the identity of those chemical products which caused Plaintiff GEORGE FRANCO's meningioma; nor did Plaintiffs personally ascertain any ingredients or contaminants of the products to which Plaintiff, GEORGE FRANCO, was exposed at work that caused Plaintiff 's meningioma; and to this very date, Plaintiffs personally remain ignorant

of the identity of hazardous substances to which Plaintiff, GEORGE FRANCO was exposed at work that caused Plaintiff, GEORGE FRANCO's meningioma.

## FRAUDULENT CONCEALMENT OF TOXIC HAZARDS BY DEFENDANTS

50. At all material times hereto, Defendants fraudulently concealed from Plaintiffs material facts concerning the nature of the chemicals to which Plaintiff, GEORGE FRANCO, was exposed.

51. At all material times hereto, Defendants fraudulently concealed the toxic hazards of their chemical products from Plaintiffs, the hazards of the conditions under which Plaintiff, GEORGE FRANCO, was exposed to said chemical products, that GEORGE FRANCO, was being exposed to and suffering toxic injuries from said chemical products, and the cause of Plaintiff, GEORGE FRANCO's injuries and occupational disease.

52. At all material times hereto, Defendants fraudulently concealed from Plaintiffs that their products either were carcinogens, contained carcinogenic ingredients, or contained carcinogenic contaminants as a result of manufacturing processes.

53. At all material times hereto, Defendants failed to disclose to Plaintiffs toxic, hazards of their products, which Defendants were by law required to disclose to Plaintiff, GEORGE FRANCO, pursuant to the Hazard Communication Standard.

54. Defendants' concealment was sufficiently complete that Plaintiffs did not know, nor in the exercise of reasonable care could have known earlier than June 9, 2021 of Defendants' culpability, that Plaintiff, GEORGE FRANCO, had sustained toxic injuries, that chemicals to which GEORGE FRANCO, was occupationally exposed had caused Plaintiff, GEORGE FRANCO's meningioma, and other injuries, or that Plaintiffs had causes of action arising from Plaintiff, GEORGE FRANCO's injuries.

/ / /

/ / /

/ / /

## FIRST CAUSE OF ACTION FOR NEGLIGENCE

### (By Plaintiff, GEORGE FRANCO, Against All Named Defendants and Does 1-100)

55.     Plaintiffs refer to paragraphs 1 through 54 and, by this reference, incorporate said paragraphs hereat as though set forth in full.

56.     As chemical manufacturers and distributors, Defendants owed Plaintiff a legal duty to exercise due care in importing, producing, and distributing the foregoing chemical products to Plaintiff's place of employment in San Bernardino County, California.

57.     Defendants negligently and carelessly imported, produced, and distributed the foregoing chemical products to Plaintiff's place of employment in San Bernardino County, California, where Plaintiff, GEORGE FRANCO, was exposed to said toxic chemical products.

58.     Defendants also failed to adequately warn Plaintiff, GEORGE FRANCO of the hazards of said toxic chemical products and failed to provide adequate instructions to Plaintiff, GEORGE FRANCO for the safe handling and use of said toxic chemical products.

59.     Plaintiff, GEORGE FRANCO, was exposed to each of the foregoing toxic chemicals.

60.     Each of the toxic chemical products to which Plaintiff, GEORGE FRANCO, was exposed, was manufactured and/or supplied by the foregoing defendants, as set forth above.

61.     As a result of Plaintiff GEORGE FRANCO's exposure to the foregoing toxic chemical products, toxins within said toxic chemical products, including benzene, entered Plaintiff, GEORGE FRANCO's body.

62.     Plaintiff, GEORGE FRANCO, suffers from a specific illness, to wit, meningioma, as well as other related and consequential injuries.

63.     Each of the foregoing toxic chemical products caused Plaintiff, GEORGE FRANCO's meningioma and other injuries.

/ / /

/ / /

64.     Each toxin that entered Plaintiff, GEORGE FRANCO's body was a substantial factor in bringing about, prolonging, and/or aggravating Plaintiff, GEORGE FRANCO's meningioma and other injuries.

65.     As a direct and proximate result of said negligent acts and omissions of Defendants, Plaintiff, GEORGE FRANCO, suffered from meningioma and other related and consequential medical conditions.

66.     As a direct and proximate result of said negligent acts and omissions of Defendants, Plaintiffs have been required to expend money and incur obligations for medical and related expenses in an amount not yet determined but which is well in excess of the jurisdictional minimum of the Court, and Plaintiff, GEORGE FRANCO, has been unable to attend to his usual employment and activities.

67.     As a further direct and proximate result of the negligent acts and omissions of defendants resulting in his severe toxic injuries, Plaintiff, GEORGE FRANCO, has suffered lost income and will continue to suffer loss of future income, support and maintenance, all to Plaintiff's damage in a sum to be established according to proof.

68.     As a further direct and proximate result of the actions and inactions of defendants resulting in severe toxic injuries, Plaintiff, GEORGE FRANCO, has suffered and will continue to suffer general damages to be established according to proof at trial.

**SECOND CAUSE OF ACTION FOR STRICT LIABILITY - WARNING DEFECT**

**(By Plaintiff, GEORGE FRANCO, Against All Named Defendants and Does 1-100)**

69.     Plaintiffs refer to paragraphs 1 through 68 and, by this reference, incorporate said paragraphs hereat as though set forth in full.

70.     At all times mentioned herein, defendants were the importers, producers, and distributors of chemical products which were delivered to or used at Plaintiff's place of employment in San Bernardino County, California, where Plaintiff, GEORGE FRANCO, was exposed to them.

71.    The chemical products which Defendants imported, produced, and distributed to Plaintiff's place of employment in San Bernardino County, California, were defective, because they lacked warnings adequate to apprise Plaintiff of their toxic hazards and their serious effects upon the human body, and they lacked instructions for handling and use adequate to prevent exposures to Plaintiff causing serious injuries and disease.

72.    Plaintiff, GEORGE FRANCO, was exposed to each of the foregoing toxic chemicals.

73.    Each of the toxic chemical products to which Plaintiff, GEORGE FRANCO, was exposed, was manufactured and/or supplied by the foregoing defendants, as set forth above.

74.    As a result of Plaintiff GEORGE FRANCO's exposure to the foregoing toxic chemical products, toxins within said toxic chemical products, including benzene, entered Plaintiff, GEORGE FRANCO's body.

75.    Plaintiff, GEORGE FRANCO, suffers from a specific illness, to wit, meningioma, as well as other related and consequential injuries.

76.    Each of the foregoing toxic chemical products caused Plaintiff, GEORGE FRANCO's meningioma and other injuries.

77.    Each toxin that entered Plaintiff, GEORGE FRANCO's body was a substantial factor in bringing about, prolonging, and/or aggravating Plaintiff, GEORGE FRANCO's meningioma and other injuries.

78.    As a direct and proximate result of the defective warnings of Defendants' chemical products, Plaintiff, GEORGE FRANCO, suffered from meningioma and other related and consequential medical conditions.

79.    As a direct and proximate result of the defective warnings of Defendants' chemical products, Plaintiffs have been required to expend money and incur obligations for medical and related expenses in an amount not yet determined but which is well in excess of the jurisdictional

minimum of the Court, and Plaintiff, GEORGE FRANCO, has been unable to attend to his usual employment and activities.

80.     As a further direct and proximate result of the defective warnings of Defendants' chemical products, Plaintiff, GEORGE FRANCO, has suffered lost income and will continue to suffer loss of future income, support and maintenance, all to Plaintiff's damage in a sum to be established according to proof.

81.     As a further direct and proximate result of defective warnings of Defendants' chemical products, Plaintiff, GEORGE FRANCO, has suffered and will continue to suffer general damages according to proof at trial.

82.     In exposing Plaintiff to said toxic chemicals, Defendants failed to warn Plaintiff of known dangers, consciously disregarded Plaintiff's safety despite knowledge of the probable dangerous consequences of their chemicals, and willfully and deliberately failed to avoid said dangerous consequences befalling Plaintiff. Defendants were either aware of, or culpably indifferent to, unnecessary risks of injury to Plaintiff and failed and refused to take steps to eliminate or adequately reduce the risk of said dangerous consequences to Plaintiff. Defendants concealed known toxic hazards of their chemicals from Plaintiff, specifically by failing to warn Plaintiff of adverse toxic effects of their chemicals, and such hazards were known by and such concealment was ratified by the corporate officers and managers of each of the defendants. Defendants consciously decided to market their chemical products with knowledge of their harmful effects and without remedying the toxic effects of their chemicals, and such marketing despite knowledge of the foregoing toxic hazards of Defendants' products was ratified by the corporate officers and managers of each of the defendants. Defendants also misrepresented the nature of their chemical products, by withholding information from Plaintiff regarding toxic chemicals released from their products during their anticipated or reasonably foreseeable uses, and such misrepresentation and withholding of information was ratified by the corporate officers and managers of each of the defendants.

COMPLAINT FOR TOXIC INJURIES
PAGE 14

83.     Safety-Kleen has known for years that its "recycled" Safety-Kleen 105 Solvent contains benzene.

84.     Safety-Kleen has also known for years that benzene and other chlorinated compounds found in recycled Safety-Kleen 105 Solvent cause cancer and other serious health risks and diseases.

85.     In the early 1990s, Paul Dittmar, Safety-Kleen's Product and Process Development Manager, was assigned the task of determining the extent of the solvent contamination problem and identifying remedial technologies. In a memo addressed to the company's general counsel, Mr. Dittmar concluded that the solvent contamination problem was a major problem. He determined that a number of different technologies existed to resolve the problem, but that the best and simplest technology was fractional distillation -- technology which has been used to refine crude oil since the turn of the century.

86.     Mr. Dittmar determined that the use of such technology would totally eliminate benzene from the recycled product and reduce the chlorinated content of the solvent by 90%. Mr. Dittmar, who is not only a chemist but also holds a Masters Degree in Business Administration, then proceeded to determine the cost of implementing fractional distillation technology at Safety-Kleen's domestic recycling centers. He determined that the cost of installation of the fractional distillation equipment would only be about $1 million for each of the company's half-dozen recycling facilities and that the additional cost of processing the solvent would be about 2 to 4 cents per gallon.

87.     Although Safety-Kleen was aware that its recycling process was defective and that it could be easily remedied for a capital expenditure of $1 million for each of its half-dozen recycling facilities (about ½ of one percent of its annual gross revenues) and a cost of about 3 cents per gallon (which could easily have been passed on to its customers), Safety-Kleen did not install fractional distillation equipment at its recycle centers.

88.     Although Safety-Kleen was aware that the benzene and chlorinated compounds in its recycled Safety-Kleen 105 Solvent caused cancer and other health problems and diseases, and knew of a cost-efficient method of removing these cancer-causing substances from Safety-Kleen 105 Solvent, Safety-Kleen instead chose to continue marketing its solvent without warnings regarding the cancer hazards of the product, and without remedying such hazards.

89.     Safety-Kleen did not list carcinogens present in Safety-Kleen 105 Solvent if the carcinogen was at levels below 0.1 percent, in a further effort to lead customers and users to believe the product was safe, when in fact it was not.

90.     Safety-Kleen falsely told some people that its Safety-Kleen 105 Solvent contains no benzene, and told other people benzene was not an "ingredient" of Safety-Kleen 105 Solvent to mislead people into believing there was no benzene in Safety-Kleen 105 Solvent. To further this, for many years Safety-Kleen chose not to list benzene on its parts washer machine labels to further convince customers its product contained no benzene.

91.     Without possessing any scientific or medical proof to establish the purported fact, Safety-Kleen told customers that the amount of chlorinated compounds in Safety-Kleen 105 Solvent was so minuscule that it did not create any health hazards.

92.     Safety-Kleen was aware of the toxic hazards of its 105 Solvent as demonstrated by the fact that Safety-Kleen required its employees who worked with the 105 Solvent to wear protective gear including a full chemical suit, gloves, boots and a respirator, and mandated medical testing for liver, kidney and blood disease every one to two years for those employees.

93.     Safety-Kleen's recycling process increased the levels of chlorinated compounds (e.g., perc) in Safety-Kleen 105 Solvent that Safety-Kleen distributed for use by its customers, thereby making it more harmful and toxic.

94.     Safety-Kleen's own products contributed to the contamination of Safety-Kleen 105 Solvent, thereby making it more toxic than it otherwise would have been.

95.     Safety-Kleen's only concern regarding issues with its 105 Solvent (e.g., receiving off-spec material below the flashpoint) was how such would affect Safety-Kleen's liability position, rather than a concern for the health and safety of its customers or their employees.

96.     In preparing its MSDS's, Safety-Kleen's only concern was that from a marketing perspective, listing certain carcinogenic ingredients of its 105 Solvent on MSDS's would make marketing the product more difficult. Safety-Kleen gave no consideration to the health and safety of Safety-Kleen's customers or of their right to know of carcinogens in Safety-Kleen 105 Solvent.

97.     For marketing reasons, Safety-Kleen wanted to get levels of carcinogens (e.g., perc) below OSHA levels so Safety-Kleen did not have to list those carcinogens on its material safety data sheets, but Safety-Kleen decided not to spend the money to accomplish this, because Safety-Kleen decided that it would not achieve a significant marketing benefit by being able not to list carcinogens on the material safety data sheet for Safety-Kleen 105 Solvent.

98.     Safety-Kleen could have removed perchloroethylene, benzene, and other chlorinated compounds from Safety-Kleen 105 Solvent for nominal cost (2-4 cents per gallon) through fractional distillation but chose not to do so unless and until governmental agencies required Safety-Kleen to do such. This decision was made because Safety-Kleen's marketing department determined that removal of these compounds would not provide a sufficient marketing benefit to justify making the product safe.

99.     Although detergent-based technology was available, affordable and marketable, Safety-Kleen did not convert any of its solvent tanks to the less-toxic water-based cleaner until required to do so by law.

100.    Safety-Kleen is well aware that its 105 Solvent has contaminated multiple sites where its recycle facilities are located across the country.

101.    Multiple enforcement actions and fines have been imposed upon Safety-Kleen in California and elsewhere due to environmental non-compliance issues and Safety-Kleen's contamination of different sites in the United States.

102.    As a condition of settling a leukemia case in the 1980s, (the Junker case), Safety-Kleen required that all evidence and records be sealed by the court and destroyed by counsel to conceal information, including scientific data, that had been discovered and developed during the course of the litigation.

103.    Despite receiving hundred of claims that Safety-Kleen 105 Solvent has caused blood related cancers, other cancers, and systemic toxicity resulting in organ failure and death, Safety-Kleen continues to market its 105 Solvent today.

104.    Defendants' conduct in exposing Plaintiff to said toxic chemicals without adequate warnings of their toxic hazards and without adequate instructions for safe handling and use was despicable, malicious, oppressive, and perpetrated in conscious disregard of the rights and safety of Plaintiffs, entitling Plaintiffs to punitive and exemplary damages.

## THIRD CAUSE OF ACTION FOR STRICT LIABILITY - DESIGN DEFECT
## (By Plaintiff, GEORGE FRANCO, Against All Named Defendants and Does 1-100)

105.    Plaintiffs refer to paragraphs 1 through 104 and, by this reference, incorporate said paragraphs herein as though set forth in full.

106.    At all times mentioned herein, Defendants were the importers, producers, and distributors of chemical products which were delivered to or used at Plaintiff's various places of employment in San Bernardino County, California, where Plaintiff, GEORGE FRANCO, was exposed to them.

107.    Said chemical products were defective in their design because they failed to perform as safely as an ordinary user would expect when used in an intended or reasonably foreseeable manner, because the risks of using and being exposed to Defendants' products outweighed the benefits of said products, and because safer feasible alternative designs existed which would have made Defendants' products less harmful when used as intended.

108.    Safety-Kleen's parts washer machines were defective in their design for at least three reasons:

a.      First, the machines lacked a local exhaust ventilation device to remove toxic vapors from the solvent and prevent workers operating the machine from inhaling them. Such devices have long been used in industry and a ventilation device could, and should, have been designed as a standard part of the machine. Such a device would have substantially reduced operator exposure to toxic solvent vapors by inhalation, the primary exposure hazard to the solvent. Of course, a more sophisticated device such as a horizontal laminar airflow hood would have totally eliminated respiratory exposure to the solvent. Such devices have commonly been used in hazardous industrial applications since the early 1980s.

b.      Second, the machines lacked a barrier to prevent solvent from splashing onto machine operators. The ordinary operation of the machine as intended results in much splashing of solvent on operators' arms, face, neck and upper torso. This exposure presents a substantial skin absorption hazard. A simple plastic barrier slightly above the lip of the sink on the front of the machine (with space below for the operator to insert his hands to degrease parts) could prevent the splashing of solvent on exposed areas of workers' bodies. Of course, a more sophisticated devices than a plastic barrier, such as a glove box, would have provided even greater dermal protection.

c.      Third, the machines lacked a cyclonic separator or other solvent-purifying device. A cyclonic separator is a device which filters solid particles out of contaminated solvent by means of centrifugal force, trapping the particles in a chamber for removal. The cyclonic separator reduces contamination of the solvent and customer exposure to certain toxins that contaminate the solvent. It also reduces odors and emissions of volatile organic compounds and even extends the useful life of the solvent. The cyclonic separator technology is hardly rocket science and its effectiveness has been proven. Indeed, Safety-Kleen provides the device it to its customers in a similar "green" machine for use with a less toxic solvent.

///

///

COMPLAINT FOR TOXIC INJURIES
PAGE 19

109. The recycled Safety-Kleen 105 Solvent is defective for at least two reasons:

a. First, it contains high levels of toxic and carcinogenic chlorinated solvents which do not exist in virgin mineral spirits. Indeed, toxic chlorinated compounds accumulate and concentrate in the solvent as these toxic chemicals are introduced into the solvent stream by automotive customers at a rate greater than they are removed by carry-off and evaporation.

b. Second, the benzene content of the recycled solvent is substantially greater than the benzene content of virgin mineral spirits, due to introduction of benzene-containing gasoline into the solvent by customers.

110. Said design defects existed in Defendants' products when said products left Defendants' possession.

111. As a direct and proximate result of said design defects, while using said chemical products in a manner that was reasonably foreseeable and intended by Defendants, Plaintiff was exposed to Defendants' chemical products in the course of his employment with various places of employment in San Bernardino County, California, and has suffered serious injuries and disease, including meningioma and other related medical conditions.

112. Plaintiff, GEORGE FRANCO, was exposed to each of the foregoing toxic chemicals.

113. Each of the toxic chemical products to which Plaintiff, GEORGE FRANCO, was exposed, was manufactured and/or supplied by the foregoing defendants, as set forth above.

114. As a result of Plaintiff GEORGE FRANCO's exposure to the foregoing toxic chemical products, toxins within said toxic chemical products, including benzene, entered Plaintiff, GEORGE FRANCO's body.

115. Plaintiff, GEORGE FRANCO, suffers from a specific illness, to wit, Convexity meningioma, as well as other related and consequential injuries.

116. Each of the foregoing toxic chemical products caused Plaintiff, GEORGE FRANCO's meningioma and other injuries.

117.    Each toxin that entered Plaintiff, GEORGE FRANCO's body was a substantial factor in bringing about, prolonging, and/or aggravating Plaintiff, GEORGE FRANCO's meningioma and other injuries.

118.    As a direct and proximate result of the defective design of Defendants' chemical products, Plaintiff, GEORGE FRANCO, suffers from meningioma and other related and consequential medical conditions.

119.    As a direct and proximate result of the defective design of Defendants' chemical products, Plaintiffs have been required to expend money and incur obligations for medical and related expenses in an amount not yet determined but well in excess of the jurisdictional minimum of this Court, and Plaintiff, GEORGE FRANCO, has been unable to attend to Plaintiff, GEORGE FRANCO's usual employment and activities.

120.    As a further direct and proximate result of the defective design of Defendants' chemical products, Plaintiff, GEORGE FRANCO, has suffered lost income and will continue to suffer loss of future income, support and maintenance, all to Plaintiff's damage in a sum to be established according to proof.

121.    As a further direct and proximate result of defective nature of said chemical products, Plaintiff, GEORGE FRANCO, has suffered and will continue to suffer general damages according to proof at trial.

122.    In exposing Plaintiff to said toxic chemicals, Defendants failed to warn Plaintiff of known dangers, consciously disregarded Plaintiff's safety despite knowledge of the probable dangerous consequences of their chemicals, and willfully and deliberately failed to avoid said dangerous consequences befalling Plaintiff. Defendants were either aware of, or culpably indifferent to, unnecessary risks of injury to Plaintiff and failed and refused to take steps to eliminate or adequately reduce the risk of said dangerous consequences to Plaintiff. Defendants concealed known toxic hazards of their chemicals from Plaintiff, specifically by failing to warn Plaintiff of adverse toxic effects of their chemicals, and such hazards were known by and such

concealment was ratified by the corporate officers and managers of each of the defendants. Defendants consciously decided to market their chemicals with knowledge of their harmful effects and without remedying the toxic effects of their chemicals, and such marketing despite knowledge of the foregoing toxic hazards of Defendants' products was ratified by the corporate officers and managers of each of the defendants. Defendants also misrepresented the nature of their chemical products, by withholding information from Plaintiff regarding toxic chemicals released from their products during their anticipated or reasonably foreseeable uses, and such misrepresentation and withholding of information was ratified by the corporate officers and managers of each of the defendants.

123.   Safety-Kleen has known for years that its "recycled" Safety-Kleen 105 Solvent contains benzene.

124.   Safety-Kleen has also known for years that benzene and other chlorinated compounds found in recycled Safety-Kleen 105 Solvent cause cancer and other serious health risks and diseases.

125.   In the early 1990s, Paul Dittmar, Safety-Kleen's Product and Process Development Manager, was assigned the task of determining the extent of the solvent contamination problem and identifying remedial technologies. In a memo addressed to the company's general counsel, Mr. Dittmar concluded that the solvent contamination problem was a major problem. He determined that a number of different technologies existed to resolve the problem, but that the best and simplest technology was fractional distillation -- technology which has been used to refine crude oil since the turn of the century.

126.   Mr. Dittmar determined that the use of such technology would totally eliminate benzene from the recycled product and reduce the chlorinated content of the solvent by 90%. Mr. Dittmar, who is not only a chemist but also holds a master's degree in business administration, then proceeded to determine the cost of implementing fractional distillation technology at Safety-Kleen's domestic recycling centers. He determined that the cost of installation of the fractional

distillation equipment would only be about $1 million for each of the company's half-dozen recycling facilities and that the additional cost of processing the solvent would be about 2 to 4 cents per gallon.

127.    Although Safety-Kleen was aware that its recycling process was defective and that it could be easily remedied for a capital expenditure of $1 million for each of its half-dozen recycling facilities (about ½ of one percent of its annual gross revenues)and a cost of about 3 cents per gallon (which could easily have been passed on to its customers), Safety-Kleen did not install fractional distillation equipment at its recycle centers.

128.    Although Safety-Kleen was aware that the benzene and chlorinated compounds in its recycled Safety-Kleen 105 Solvent caused cancer and other health problems and diseases, and knew of a cost-efficient method of removing these cancer-causing substances from Safety-Kleen 105 Solvent, Safety-Kleen instead chose to continue marketing its solvent without warnings regarding the cancer hazards of the product, and without remedying such hazards.

129.    Safety-Kleen did not list carcinogens present in Safety-Kleen 105 Solvent if the carcinogen was at levels below 0.1 percent, in a further effort to lead customers and users to believe the product was safe, when in fact it was not.

130.    Safety-Kleen falsely told some people that its Safety-Kleen 105 Solvent contains no benzene, and told other people benzene was not an "ingredient" of Safety-Kleen 105 Solvent to mislead people into believing there was no benzene in Safety-Kleen 105 Solvent. To further this, for many years Safety-Kleen chose not to list benzene on its parts washer machine labels to further convince customers its product contained no benzene.

131.    Without possessing any scientific or medical proof to establish the purported fact, Safety-Kleen told customers that the amount of chlorinated compounds in Safety-Kleen 105 Solvent was so minuscule that it did not create any health hazards.

132.    Safety-Kleen was aware of the toxic hazards of its 105 Solvent as demonstrated by the fact that Safety-Kleen required its employees who worked with the 105 Solvent to wear

protective gear including a full chemical suit, gloves, boots and a respirator, and mandated medical testing for liver, kidney and blood disease every one to two years for those employees.

133. Safety-Kleen's recycling process increased the levels of chlorinated compounds (e.g., perc) in Safety-Kleen 105 Solvent that Safety-Kleen distributed for use by its customers, thereby making it more harmful and toxic.

134. Safety-Kleen's own products contributed to the contamination of Safety-Kleen 105 Solvent, thereby making it more toxic than it otherwise would have been.

135. Safety-Kleen's only concern regarding issues with its 105 Solvent (e.g., receiving off-spec material below the flashpoint) was how such would affect Safety-Kleen's liability position, rather than a concern for the health and safety of its customers or their employees.

136. In preparing its MSDS's, Safety-Kleen's only concern was that from a marketing perspective, listing certain carcinogenic ingredients of its 105 Solvent on MSDS's would make marketing the product more difficult. Safety-Kleen gave no consideration to the health and safety of Safety-Kleen's customers or of their right to know of carcinogens in Safety-Kleen 105 Solvent.

137. For marketing reasons, Safety-Kleen wanted to get levels of carcinogens (e.g., perc) below OSHA levels so Safety-Kleen did not have to list those carcinogens on its material safety data sheets, but Safety-Kleen decided not to spend the money to accomplish this, because Safety-Kleen decided that it would not achieve a significant marketing benefit by being able not to list carcinogens on the material safety data sheet for Safety-Kleen 105 Solvent.

138. Safety-Kleen could have removed perchloroethylene, benzene, and other chlorinated compounds from Safety-Kleen 105 Solvent for nominal cost (2-4 cents per gallon) through fractional distillation, but chose not to do so unless and until governmental agencies required Safety-Kleen to do such. This decision was made because Safety-Kleen's marketing department determined that removal of these compounds would not provide a sufficient marketing benefit to justify making the product safe.

139.   Although detergent-based technology was available, affordable and marketable, Safety-Kleen did not convert any of its solvent tanks to the less-toxic water-based cleaner until required to do so by law.

140.   Safety-Kleen engaged in numerous unethical and improper behaviors in California, including fraudulently billing customers for services not performed and products not provided, falsely representing the nature of its parts washer machine to customers in violation of state and federal consumer protection laws, and replacing used solvent in such a way that it risked the health and safety of Safety-Kleen's customers and employees.

141.   Safety-Kleen is well aware that its 105 Solvent has contaminated multiple sites where its recycle facilities are located across the country.

142.   Multiple enforcement actions and fines have been imposed upon Safety-Kleen in California and elsewhere due to environmental non-compliance issues and Safety-Kleen's contamination of different sites in the United States.

143.   As a condition of settling a leukemia case in the 1980s, (the Junker case), Safety-Kleen required that all evidence and records be sealed by the court and destroyed by counsel to conceal information, including scientific data, that had been discovered and developed during the course of the litigation.

144.   Despite receiving hundred of claims that Safety-Kleen 105 Solvent has caused blood related cancers, other cancers, and systemic toxicity resulting in organ failure and death, Safety-Kleen continues to market its 105 Solvent today.

145.   Defendants' conduct in exposing Plaintiff to said toxic chemicals without adequate warnings of their toxic hazards and without adequate instructions for safe handling and use was despicable, malicious, oppressive, and perpetrated in conscious disregard of the rights and safety of Plaintiffs, entitling Plaintiffs to punitive and exemplary damages.

/ / /

/ / /

COMPLAINT FOR TOXIC INJURIES
PAGE 25

## FOURTH CAUSE OF ACTION FOR FRAUDULENT CONCEALMENT

### (By Plaintiff, GEORGE FRANCO, Against All Named Defendants and Does 1-100)

146.    Plaintiffs refer to paragraphs 1 through 145 and, by this reference, incorporate said paragraphs herein in full.

147.    At all times mentioned herein, Defendants were the importers, producers, and distributors of chemical products which were delivered to or used at Plaintiff's place of employment in San Bernardino, California, where Plaintiff, GEORGE FRANCO, was exposed to them.

148.    Defendants' chemical products to which Plaintiff was exposed are toxic.

149.    Defendants were aware of the toxic nature of their products.

150.    Pursuant to the Hazard Communication Standard and California common law, Defendants were under a legal duty to fully disclose the toxic properties of their products directly to Plaintiff.

151.    Notwithstanding their knowledge of the toxic properties of their chemical products, at all material times hereto, Defendants concealed said toxic hazards from Plaintiff, GEORGE FRANCO, so that Plaintiff, GEORGE FRANCO, would use Defendants' chemical products.

152.    Plaintiff, GEORGE FRANCO, was unaware of the toxic hazards of Defendants' chemicals and would not have acted as he did had he known of said concealed hazards.

153.    As a direct and proximate result of Defendants' fraudulent concealment of the toxic hazards of their chemical products, Plaintiff, GEORGE FRANCO, was exposed to Defendants' chemical products in the course of his employment with various places of employment in Los Angeles County, California, and has suffered serious injuries and disease, including Convexity meningioma and other related medical conditions.

154.    Plaintiff, GEORGE FRANCO, was exposed to each of the foregoing toxic chemicals.

155.  Each of the toxic chemical products to which Plaintiff, GEORGE FRANCO, was exposed, was manufactured and/or supplied by the foregoing defendants, as set forth above.

156.  As a result of Plaintiff GEORGE FRANCO's exposure to the foregoing toxic chemical products, toxins within said toxic chemical products, including benzene, entered Plaintiff, GEORGE FRANCO's body.

157.  Plaintiff, GEORGE FRANCO, suffers from a specific illness, to wit, meningioma, as well as other related and consequential injuries.

158.  Each of the foregoing toxic chemical products caused Plaintiff, GEORGE FRANCO's meningioma another injuries.

159.  Each toxin that entered Plaintiff, GEORGE FRANCO's body was a substantial factor in bringing about, prolonging, and/or aggravating Plaintiff, GEORGE FRANCO's meningioma and other injuries.

160.  As a direct and proximate result of Defendants' fraudulent concealment of the toxic hazards of their chemicals, Plaintiff, GEORGE FRANCO, suffers from meningioma and other related and consequential medical conditions.

161.  As a direct and proximate result of Defendants' fraudulent concealment of the toxic hazards of their chemicals, Plaintiffs have been required to expend money and incur obligations for medical and related expenses in an amount not yet determined but which is well in excess of the jurisdictional minimum of the Court, and Plaintiff, GEORGE FRANCO, has been unable to attend to his usual employment and activities.

162.  As a further direct and proximate result of Defendants' fraudulent concealment of the toxic hazards of their chemical products, Plaintiff, GEORGE FRANCO, has suffered lost income and will continue to suffer loss of future income, support and maintenance, all to Plaintiff's damage in a sum to be established according to proof.

163.    As a further direct and proximate result of Defendants' fraudulent concealment of the toxic hazards of their chemical products, Plaintiff, GEORGE FRANCO, has suffered and will continue to suffer general damages to be established according to proof at trial.

164.    In exposing Plaintiff to said toxic chemicals, Defendants failed to warn Plaintiff of known dangers, consciously disregarded Plaintiff's safety despite knowledge of the probable dangerous consequences of their chemicals, and willfully and deliberately failed to avoid said dangerous consequences befalling Plaintiff. Defendants were either aware of, or culpably indifferent to, unnecessary risks of injury to Plaintiff and failed and refused to take steps to eliminate or adequately reduce the risk of said dangerous consequences to Plaintiff. Defendants concealed known toxic hazards of their chemicals from Plaintiff, specifically by failing to warn Plaintiff of adverse toxic effects of their chemicals, and such hazards were known by and such concealment was ratified by the corporate officers and managers of each of the defendants. Defendants consciously decided to market their chemicals with knowledge of their harmful effects and without remedying the toxic effects of their chemicals, and such marketing despite knowledge of the foregoing toxic hazards of Defendants' products was ratified by the corporate officers and managers of each of the defendants. Defendants also misrepresented the nature of their chemical products, by withholding information from Plaintiff regarding toxic chemicals released from their products during their anticipated or reasonably foreseeable uses, and such misrepresentation and withholding of information was ratified by the corporate officers and managers of each of the defendants.

165.    Safety-Kleen has known for years that its "recycled" Safety-Kleen 105 Solvent contains benzene.

/ / /

/ / /

166.    Safety-Kleen has also known for years that benzene and other chlorinated compounds found in recycled Safety-Kleen 105 Solvent cause cancer and other serious health risks and diseases.

167.    In the early 1990s, Paul Dittmar, Safety-Kleen's Product and Process Development Manager, was assigned the task of determining the extent of the solvent contamination problem and identifying remedial technologies. In a memo addressed to the company's general counsel, Mr. Dittmar concluded that the solvent contamination problem was a major problem. He determined that a number of different technologies existed to resolve the problem, but that the best and simplest technology was fractional distillation -- technology which has been used to refine crude oil since the turn of the century.

168.    Mr. Dittmar determined that the use of such technology would totally eliminate benzene from the recycled product and reduce the chlorinated content of the solvent by 90%. Mr. Dittmar, who is not only a chemist but also holds a Masters Degree in Business Administration, then proceeded to determine the cost of implementing fractional distillation technology at Safety-Kleen's domestic recycling centers. He determined that the cost of installation of the fractional distillation equipment would only be about $1 million for each of the company's half-dozen recycling facilities and that the additional cost of processing the solvent would be about 2 to 4 cents per gallon.

169.    Although Safety-Kleen was aware that its recycling process was defective and that it could be easily remedied for a capital expenditure of $1 million for each of its half-dozen recycling facilities (about ½ of one percent of its annual gross revenues) and a cost of about 3 cents per gallon (which could easily have been passed on to its customers), Safety-Kleen did not install fractional distillation equipment at its recycle centers.

170.    Although Safety-Kleen was aware that the benzene and chlorinated compounds in its recycled Safety-Kleen 105 Solvent caused cancer and other health problems and diseases, and knew of a cost-efficient method of removing these cancer-causing substances from Safety-Kleen

105 Solvent, Safety-Kleen instead chose to continue marketing its solvent without warnings regarding the cancer hazards of the product, and without remedying such hazards.

171.    Safety-Kleen did not list carcinogens present in Safety-Kleen 105 Solvent if the carcinogen was at levels below 0.1 percent, in a further effort to lead customers and users to believe the product was safe, when in fact it was not.

172.    Safety-Kleen falsely told some people that its Safety-Kleen 105 Solvent contains no benzene, and told other people benzene was not an "ingredient" of Safety-Kleen 105 Solvent to mislead people into believing there was no benzene in Safety-Kleen 105 Solvent. To further this, for many years Safety-Kleen chose not to list benzene on its parts washer machine labels to further convince customers its product contained no benzene.

173.    Without possessing any scientific or medical proof to establish the purported fact, Safety-Kleen told customers that the amount of chlorinated compounds in Safety-Kleen 105 Solvent was so minuscule that it did not create any health hazards.

174.    Safety-Kleen was aware of the toxic hazards of its 105 Solvent as demonstrated by the fact that Safety-Kleen required its employees who worked with the 105 Solvent to wear protective gear including a full chemical suit, gloves, boots and a respirator, and mandated medical testing for liver, kidney and blood disease every one to two years for those employees.

175.    Safety-Kleen's recycling process increased the levels of chlorinated compounds (e.g., perc) in Safety-Kleen 105 Solvent that Safety-Kleen distributed for use by its customers, thereby making it more harmful and toxic.

176.    Safety-Kleen's own products contributed to the contamination of Safety-Kleen 105 Solvent, thereby making it more toxic than it otherwise would have been.

177.    Safety-Kleen's only concern regarding issues with its 105 Solvent (e.g., receiving off-spec material below the flashpoint) was how such would affect Safety-Kleen's liability position, rather than a concern for the health and safety of its customers or their employees.

178.   In preparing its MSDS's, Safety-Kleen's only concern was that from a marketing perspective, listing certain carcinogenic ingredients of its 105 Solvent on MSDS's would make marketing the product more difficult. Safety-Kleen gave no consideration to the health and safety of Safety-Kleen's customers or of their right to know of carcinogens in Safety-Kleen 105 Solvent.

179. ·   For marketing reasons, Safety-Kleen wanted to get levels of carcinogens (e.g., perc) below OSHA levels so Safety-Kleen did not have to list those carcinogens on its material safety data sheets, but Safety-Kleen decided not to spend the money to accomplish this, because Safety-Kleen decided that it would not achieve a significant marketing benefit by being able not to list carcinogens on the material safety data sheet for Safety-Kleen 105 Solvent.

180.   Safety-Kleen could have removed perchloroethylene, benzene, and other chlorinated compounds from Safety-Kleen 105 Solvent for nominal cost (2-4 cents per gallon) through fractional distillation, but chose not to do so unless and until governmental agencies required Safety-Kleen to do such. This decision was made because Safety-Kleen's marketing department determined that removal of these compounds would not provide a sufficient marketing benefit to justify making the product safe.

181.   Although detergent-based technology was available, affordable and marketable, Safety-Kleen did not convert any of its solvent tanks to the less-toxic water-based cleaner until required to do so by law.

182.   Safety-Kleen engaged in numerous unethical and improper behaviors in California, including fraudulently billing customers for services not performed and products not provided, falsely representing the nature of its parts washer machine to customers in violation of state and federal consumer protection laws, and replacing used solvent in such a way that it risked the health and safety of Safety-Kleen's customers and employees.

183.   Safety-Kleen is well aware that its 105 Solvent has contaminated multiple sites where its recycle facilities are located across the country.

184.   Multiple enforcement actions and fines have been imposed upon Safety-Kleen in California and elsewhere due to environmental non-compliance issues and Safety-Kleen's contamination of different sites in the United States.

185.   As a condition of settling a leukemia case in the 1980s, (the Junker case), Safety-Kleen required that all evidence and records be sealed by the court and destroyed by counsel to conceal information, including scientific data, that had been discovered and developed during the course of the litigation.

186.   Despite receiving hundred of claims that Safety-Kleen 105 Solvent has caused blood related cancers, other cancers, and systemic toxicity resulting in organ failure and death, Safety-Kleen continues to market its 105 Solvent today.

187.   Defendants' conduct in exposing Plaintiff to said toxic chemicals without adequate warnings of their toxic hazards and without adequate instructions for safe handling and use was despicable, malicious, oppressive, and perpetrated in conscious disregard of the rights and safety of Plaintiffs, entitling Plaintiffs to punitive and exemplary damages.

## FIFTH CAUSE OF ACTION FOR BREACH OF IMPLIED WARRANTIES

### (By Plaintiff, GEORGE FRANCO, Against All Named Defendants and Does 1-100)

188.   Plaintiffs refer to paragraphs 1 through 187 and, by this reference, incorporate said paragraphs herein as though set forth in full.

189.   At all times mentioned herein, Defendants were the importers, producers, and distributors of chemical products which were purchased by Plaintiff and delivered to or used at Plaintiff's place of employment in San Bernardino, California, where Plaintiff, GEORGE FRANCO, was exposed to them.

190.   Defendants' chemical products to which Plaintiff was exposed are toxic.

191.   By placing their chemical products in the stream of commerce, Defendants impliedly warranted that their chemical products were reasonably fit for their intended uses, that their chemical products were of merchantable quality, that they were not defective, that they

would function as safely as ordinary users would expect when used in an intended or reasonably foreseeable manner, and that they would not cause serious disease, harm, or death.

192.   Defendants, and each of them, breached said implied warranties, because their toxic chemical products were not reasonably fit for their intended uses, were not of merchantable quality, were defective, and failed to function as safely as an ordinary user would expect when used in an intended or reasonably foreseeable manner, and caused serious injuries to Plaintiff, GEORGE FRANCO, to wit, meningioma and the other injuries described herein.

193.   Plaintiff, GEORGE FRANCO, was exposed to each of the foregoing toxic chemicals.

194.   Each of the toxic chemical products to which Plaintiff, GEORGE FRANCO, was exposed, was manufactured and/or supplied by the foregoing defendants, as set forth above.

195.   As a result of Plaintiff GEORGE FRANCO's exposure to the foregoing toxic chemical products, toxins within said toxic chemical products, including benzene, entered Plaintiff, GEORGE FRANCO's body.

196.   Plaintiff, GEORGE FRANCO, suffers from a specific illness, to wit, meningioma, as well as other related and consequential injuries.

197.   Each of the foregoing toxic chemical products caused Plaintiff, GEORGE FRANCO's Convexity meningioma another injuries.

198.   Each toxin that entered Plaintiff, GEORGE FRANCO's body was a substantial factor in bringing about, prolonging, and/or aggravating Plaintiff, GEORGE FRANCO's Convexity meningioma and other injuries.

199.   As a direct and proximate result of Defendants' breaches of implied warranties, Plaintiff, GEORGE FRANCO, has suffered serious injuries and disease, including Convexity meningioma and other related and consequential medical conditions.

200.   As a direct and proximate result of Defendants' breaches of implied warranties, Plaintiffs have been required to expend money and incur obligations for medical and related

expenses in an amount not yet determined but well in excess of the jurisdictional minimum of the Court, and Plaintiff, GEORGE FRANCO, has been unable to attend to his usual employment and activities.

As a further direct and proximate result of Defendants' breaches of implied warranties, Plaintiff, GEORGE FRANCO, has suffered lost income and will continue to suffer loss of future income, support and maintenance, all to Plaintiff's damage in a sum to be established according to proof.

As a further direct and proximate result of Defendants' breaches of implied warranties, Plaintiff, GEORGE FRANCO, has suffered and will continue to suffer general damages according to proof at trial.

## SIXTH CAUSE OF ACTION FOR LOSS OF CONSORTIUM

<u>(By Plaintiff, KARLA FRANCO, Against All Named Defendants and Does 1-100)</u>

201.   Plaintiffs refer to paragraphs 1 through 200 and, by this reference, incorporate said paragraphs herein in full.

202.   At all material times hereto, Plaintiffs GEORGE FRANCO and KARLA FRANCO, have been living together as husband and wife.

203.   As a direct and proximate result of Defendants' above-described conduct and Defendants' defective chemical products, Plaintiff, KARLA FRANCO, has lost and been deprived of the services, love, companionship, comfort, affection, society, sexual relations, and solace of Plaintiff, GEORGE FRANCO, all to the special and general damage of Plaintiff KARLA FRANCO. Plaintiff anticipates further loss of consortium in the future.

/ / /

/ / /

/ / /

/ / /

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgement as follows:

1. For general damages in a sum in excess of the minimum jurisdictional amount of the court;

2. For medical expenses according to proof;

3. For post-judgment interest allowed by law;

4. For punitive damages according to proof;

5. For Plaintiffs' costs of suit incurred herein; and,

6. For such other and further relief as the Court deems just and proper.

DATED: June 2, 2023                **TRIAL LAWYERS FOR JUSTICE**


By: *Brian Ward*
BRIAN WARD, ESQ.
ERIN POWERS, ESQ.
Attorneys for Plaintiff
GEORGE FRANCO

COMPLAINT FOR TOXIC INJURIES
PAGE 35



JUN 0 5 2023

SUPERIOR COURT OF CALIFORNIA
SAN BERNARDINO DISTRICT